UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SLATTEN, LLC, et al.                    CIVIL ACTION

VERSUS                                  NO: 13-673

ROYAL CARIBBEAN CRUISES LTD.,           SECTION: R(5)
et al.

## ORDER AND REASONS

Before the Court are two motions for summary judgment.  Third-party defendants United Bulk Terminals Davant, L.L.C. ("UBT") and Marquette Transportation Company Gulf-Inland, L.L.C. move for summary judgment against plaintiff Slatten, LLC, the owner of the ALLISON S, and Bisso Towboat Company, Inc., the owner *pro hac vice* of the ALLISON S (collectively, "Slatten"), and plaintiff-intervenors, Mark Blancq, Anthony Fortier, and Kirkland Hutson.[1] Marquette also moves for summary judgment against UBT.[2]  For the following reasons, the Court denies the motions.

## I. Background

This consolidated maritime action arises out of a breakaway incident on the lower Mississippi River in the early morning hours of January 26, 2013.  Before the breakaway, the tugboat ALLISON S was moored to a number of Marquette's barges at UBT's fleeting

---

[1]     R. Docs. 105 and 113.

[2]     R. Doc. 107.

facility in Davant, Louisiana.  Sometime after 3:00 A.M., the barges and the ALLISON S broke loose from their mooring and drifted downstream.  The ALLISON S allided with the anchored vessel HIGH STRENGTH, which caused it to sustain damage and its crew to allegedly suffer personal injuries.  In addition, several of the breakaway barges struck and damaged the B. No. 275, an anchored barge belonging to Bouchard.

The parties dispute the cause of the breakaway.  Slatten commenced this action against defendant Royal Caribbean.[3]  Slatten alleges that on January 26, 2013 Royal Caribbean's cruise ship, the NAVIGATOR OF THE SEAS ("NAVIGATOR"), overtook the NESTOS, an oil tanker owned and/or operated by Beverley, in the Mississippi River in the area of UBT's fleeting facility.  Slatten contends that the NAVIGATOR traveled at a speed greater than 14 knots as it overtook the NESTOS and that the wake and suction that the NAVIGATOR generated as it passed the fleeting facility caused the breakaway of the ALLISON S and the barges.[4]

Royal Caribbean made UBT, Marquette and Beverley third-party defendants to Slatten's claims, under Federal Rule of Civil Procedure 14(c).[5]  Royal Caribbean alleges that the breakaway was caused by the negligence of UBT and/or Marquette in failing to

---

[3]    R. Doc. 1.

[4]    *Id*. at 3.

[5]    R. Docs. 10, 15.

2

provide adequate moorings to secure the fleet.[6]  It further argues that, to the extent that wake and suction generated by the NAVIGATOR contributed to the breakaway, Beverley, too, is liable, because wake and suction from the NESTOS, as well as "the actions of the NESTOS," were contributing causes.[7]

Bouchard filed a separate suit against Royal Caribbean and UBT, alleging liability for damage to its barge.[8]  The Court consolidated Bouchard's suit with Slatten's suit.[9]  Royal Caribbean then made Marquette, Slatten and Beverley third-party defendants to Bouchard's claims under Rule 14(c).[10]

Three crew members of the ALLISON S, Mark Blancq, Anthony Fortier, and Kirkland Hutson, intervened in the suit.[11]  They allege that Royal Caribbean is liable for injuries they suffered when the ALLISON S allided with the HIGH STRENGTH.[12]  Royal Caribbean made

---

[6]     R. Doc. 10 at 5-6.

[7]     *Id.* at 6-7.

[8]     *Bouchard Transportation Co., Inc. v. Royal Caribbean Cruises Ltd.*, No. 13-4975, R. Doc. 1.

[9]     R. Doc. 21.

[10]    R. Doc. 32 at 8-9.

[11]    R. Doc. 61.

[12]    *Id.*

3

Slatten, UBT, Marquette and Beverley third-party defendants to the crew members' claims under Rule 14(c).[13]

Beverley moved for summary judgment on all claims against it. The Court denied Beverley's motion on August 22, 2014, finding that genuine issues of material fact remained as to whether the NESTOS caused or contributed to the breakaway.[14]

UBT and Marquette now move for summary judgment against Slatten and the crew members of the ALLISON S on the basis that they owed no duty to the ALLISON S or its crew members. Marquette also moves for summary judgment against UBT contending that it did not cause UBT's damages.

## II. Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d

---

[13]   R. Doc. 62 at 7-8.

[14]   R. Doc. 98.

395, 398-399 (5th Cir. 2008).   The Court must draw reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2738 (2d ed. 1983)).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quotation marks removed).   The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or

5

referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *Id.; see also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).

## III. UBT and Marquette's Motion for Summary Judgment

In their joint motion for summary judgment, UBT and Marquette seek dismissal of the claims of Slatten and the three crew members of the ALLISON S, Blancq, Fortier, and Hutson.[15]  UBT and Marquette argue that they owed no duty to the ALLISON S because a fleet operator owes no duty to a vessel that under its own command chooses to moor within the fleet of its own volition and for its own purposes.  For the same reason, UBT and Marquette argue that they also owed no duty to the ALLISON S's crew members.  Slatten does not oppose the motion.  Only Royal Caribbean opposes the motion.[16]

---

[15]    R. Docs. 105, 113.

[16]    R. Doc. 131.

**A. Maritime Negligence -- Duty**

Maritime tort law is governed by general principles of negligence law. *See In re Signal Intern., LLC*, 579 F.3d 478, 491 (5th Cir. 2009). A maritime tortfeasor is therefore "accountable only to those to whom a duty is owed." *Id.* (quoting *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)). The type of duty owed "is measured by the scope of the risk that negligent conduct foreseeably entails." *Id.* (quoting *Consol. Aluminum*, 833 F.2d at 67). Foreseeability is measured by "whether the harm that does occur is within the *scope of danger* created by the defendant's negligent conduct." *Id.* (quotation and citations omitted; emphasis in original). In assessing the scope of danger, courts look to the "terms of the 'natural and probable' risks that a reasonable person would likely take into account in guiding her practical conduct." *Id.* at 491-92. This includes "not only those [natural] forces which are constantly and habitually operating but also those forces which operate periodically or with a certain degree of frequency." *Id.* at 492 (quoting *Republic of Fr. v. United States*, 290 F.2d 395, 400 (5th Cir. 1961)).

**B. UBT and Marquette Owed the ALLISON S and its Crew Members a Duty**

The ALLISON S moored at UBT's fleeting facility upon receiving permission from Marquette.[17]   A duty was owed if the harm the ALLISON S and her crew members incurred "was a harm of the general sort to an entity of a general class that a reasonably thoughtful person might have anticipated to result from" UBT and Marquette's alleged negligence.  *See In re Signal Intern.*, 579 F.3d at 492.

The record shows that UBT and Marquette frequently allowed vessels, like the ALLISON S, to moor at the fleeting facility.[18] In fact, Ian Ballatin, who was aboard the ALLISON S at the time of the breakaway, reports tying up roughly once a week at UBT's facility since 2008.[19]  Thus, the mooring of vessels to UBT's barges was a reasonably foreseeable occurrence.  One of the purposes of a mooring facility is to secure the barges and prevent them from floating into the river and damaging other property.  The record also shows UBT's facility had a history of barge breakaways, including twice with the passing of larger vessels since March 2012.[20]  Passing vessels foreseeably create wakes and suction, which

---

[17]   *See* R. Doc. 113-6 at 15, deposition of Ian Ballatin.

[18]   *See* R. Doc. 131-3 at 22, deposition of Richard Rosser; R. Doc. 125-2 at 31, deposition of Richard Rosser.

[19]   R. Doc. 126-4 at 39, deposition of Ian Ballatin.

[20]   R. Doc. 108-2 at 7, expert report of Arthur Sargent; *see also* R. Doc. 131-3, deposition of Richard Rosser.

can impact moored vessels. The risk of a breakaway was a reasonably foreseeable risk from the nature of UBT's operations and its history. It is also reasonably foreseeable that a barge breakaway at UBT's facility would pose a danger to any vessels moored to the breakaway barges as well as those vessels' crew members. Finally, barge breakaways are a reasonably foreseeable consequence of UBT and Marquette's alleged negligence -- specifically, failing to use downstream mooring devices,[21] overloading the barges, disregarding safety operations, including inspections and maintenance, and failing to station vessels within the fleet.[22] For all of the foregoing reasons, UBT and Marquette owed the ALLISON S and her crew a duty of reasonable care under these circumstances. Accordingly, UBT and Marquette's motion is denied.

## IV. Marquette's Motion for Summary Judgment

Royal Caribbean made UBT, Marquette, and Beverley third-party defendants to Slatten's claims under Federal Rule of Civil Procedure 14(c).[23] UBT answered denying liability and, to the

---

[21]    The Court recognizes that whether the failure to use downstream mooring devices could have contributed to the breakaway is a disputed issue.

[22]    *See, e.g.*, R. Doc. 111-2, expert report of Christopher Karentz.

[23]    R. Docs. 10, 15.

extent it is found liable, UBT claimed that it is entitled to indemnity and contribution from the other third-party defendants, including Marquette.[24]  Marquette now moves for summary judgment on UBT's claims against it.[25]

Marquette argues that it is entitled to summary judgment on UBT's claims because it did not cause UBT's damages, which it contends are limited to the infrastructure supporting its facility, specifically, damaged rigging, buoys, and anchor lines, and the associated downtime.[26]  Marquette asserts that UBT's damages were caused exclusively by excessive wake, surge, and suction, and not by Marquette's alleged failure to keep a proper watch, inspect wires, and promptly respond to the breakaway.[27]  UBT contends that genuine issues remain as to whether Marquette's alleged breach of the Time Charter Agreement between UBT and Marquette caused the breakaway.  Under the agreement, Marquette was required to maintain continuous surveillance over the barges; to inspect the barges for movements that are unusual for properly secured barges; and to take

---

[24]    R. Doc. 30.

[25]    R. Doc. 107.

[26]    R. Doc. 107 at 1.  *See also* R. Doc. 107-2 at 2, deposition of Richard Rosser (noting that the majority of UBT's damages are limited damaged rigging, buoys, anchor lines, and the associated downtime).

[27]    R. Doc. 107-1 at 4.

immediate action to correct each deficiency.[28]   Royal Caribbean
contends that issues of fact remain as to whether Marquette caused
UBT's damages because Marquette allegedly did not implement a
downriver mooring device, maintain continuous surveillance over the
fleet, or promptly respond to the breakaway.[29]

The Court finds that genuine issues remain as to whether
Marquette took appropriate preventive actions or ameliorative post-
accident actions that could have reduced or prevented UBT's
damages.  For example, the issue of whether Marquette performed
sufficient fleet checks and stationed its boats in appropriate
positions throughout the fleet is disputed.  Richard Rosser, UBT's
representative, testified in his deposition that he was not aware
of any inspections for unusual barge movement by Marquette before
the breakaway.[30]   Rosser also stated that he was not aware of any
information showing that Marquette was aware of the breakaway
before the later damage occurred.[31]   Gerard Souvinette, a Marquette
employee present on the night of the breakaway, said that he did
not check the fleet after the NAVIGATOR passed at around 3:13 A.M.,
and that it was not until 3:40 A.M., upon receiving a call from one
of the downstream boats, that he, and presumably other Marquette

---

[28]   R. Doc. 130-2.

[29]   R. Doc. 130.

[30]   R. Doc. 130-3 at 18.

[31]   R. Doc. 125-2 at 27.

11

employees, looked for the breakaways.[32]  Souvinette also stated that Marquette's tug boats, specifically, the JEREMEY, the MARLENE ELLIS, the SAMANTHA, and the PAIGE GERTRUDE, were not positioned throughout the fleet at the time of the breakaway.[33]  According to Souvinette, despite the presence of heavy fog, Marquette's boats were still able to operate.[34]

Taken together, this evidence creates a genuine issue of fact as to whether proper positioning and surveillance could have prevented the breakaway.  Further, issues of fact remain as to whether a prompter response would have prevented or reduced UBT's damages.

Accordingly, Marquette's motion is denied.


**V. Conclusion**

For the foregoing reasons, UBT and Marquette's motion and Marquette's motion are DENIED.

New Orleans, Louisiana, this  31st  day of October, 2014.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[32]  R. Doc. 130-6 at 2-3; *see also id.* at 3 (Cruise ships "pass all the time.  I don't -- I don't go check the fleet after each one.").

[33]  *Id.* at 2.

[34]  *Id.* at 3.

12